UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| Tyler Kahler, | CASE NO. 5:16CV287 |
| Plaintiff, | JUDGE JOHN R. ADAMS |
| v. | |
| | **MEMORANDUM OF OPINION** |
| Fidelity Mutual Life, Inc., et al. | |
| Defendants. | |

This matter comes before the Court on motions for summary judgment (Docs. 55, 59) filed by Defendants Fidelity Mutual Life, Inc. ("Fidelity") and Enterprise Financial Group, Inc. ("EFG"). For the reasons that follow, the motions are GRANTED.

**I. Facts & Procedure**

This matter arises from a relatively simple factual background. Plaintiff Tyler Kahler alleges that he received a phone call on October 14, 2015. Kahler contends that it was a pre-recorded call from a speaker identified as "Oscar" with "Vehicle Protection Center." Kahler responded to several questions and then was to be transferred to another individual. However, the call was disconnected before this transfer was completed. Moments later, Kahler received a second call. Kahler claims to have spoken to a man identified as "Joe" with "National Warranty Services."

It is undisputed that Fidelity, doing business as Turnkey Auto Group ("TAG"), sells vehicle service contracts – essentially extended warranties – and also utilizes the tradename National Warranty Services. At least some portion of the warranties sold by Fidelity are in turn serviced by EFG. Moreover, as a part of its business, Fidelity entered into an agreement titled "Independent

Seller Agreement" with Admen Media Group ("Admen"). Under the Agreement, Admen would sell vehicle service contracts consistent with the contractual obligations imposed by Fidelity. The facts herein demonstrate that the calls at issue were made by employees of Admen pursuant to this Agreement.

Based upon these facts, Kahler filed suit and claims that Fidelity and EFG violated the Telephone Consumer Protection Act ("TCPA"). Both Defendants have moved for summary judgment, and the motions are now fully briefed. In addition, Kahler has moved to strike a declaration that was included in the motions for summary judgment. Doc. 64. As the Court's analysis does not rely upon that declaration, the motion is DENIED AS MOOT.

## II. Legal Standards

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. This is so that summary judgment can be used to dispose of claims and defenses which are factually unsupported. *Id.* at 324. The burden on the nonmoving party is to show, through the use of evidentiary materials, the existence of a material fact which must be tried. *Id.* The court's inquiry at the summary judgment stage is "the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex,* 477 U.S. at 324. The nonmoving party must oppose a proper summary judgment motion "by any kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves ..." *Id.* Rule 56(c) states, "... [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." A scintilla of evidence in favor of the nonmoving party is not sufficient.

When determining whether to issue a temporary restraining order or a preliminary injunction, this Court considers the following four factors:

> (1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir.1997) (en banc) (quoting *Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir.1995)). This Court must balance the four factors while noting that none should be considered a prerequisite to the grant of a preliminary injunction. *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998). Moreover, a plaintiff must present clear and convincing evidence in support of the four factors. *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 267-68 (Ohio Ct. App. 2000).

### III. Law and Analysis

Pursuant to its authority to make rules and regulations to implement the TCPA, 47 U.S.C. § 227(b)(2), the FCC has ruled that "[c]alls placed by an agent of the telemarketer are treated as if

the telemarketer itself placed the call," *In re Rules & Regulations Implementing the TCPA of 1991*, 10 FCC Rcd. 12391, 12397 (1995), and has construed actions under the TCPA "to incorporate federal common law agency principles of vicarious liability[.]" *In re Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6584 (2013). The FCC concluded that such defendants "may be held vicariously liable ... for TCPA violations ... under a broad range of [federal common-law] agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Dish Network*, 28 FCC Rcd. at 6584. As the commission explained:

> The classical definition of "agency" contemplates "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." Potential liability under general agency-related principles extends beyond classical agency, however. A principal may be liable in circumstances where a third party has apparent (if not actual) authority. Such "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." Other principles of agency law may support liability in particular cases. For example, a seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits. Such ratification may occur "through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences."

*Id*. at 6586–87 (footnotes omitted). More precisely, the FCC relies on the Restatement (Third) of Agency as the federal common law of agency. *See id*. at 6586, n.100. This Court defers to this construction of the TCPA, as well as the FCC's reliance on the Restatement. *See Keating v. Peterson's Nelnet, LLC*, 615 Fed. Appx. 365 (6th Cir. 2015).

> With respect to agency, Kahler argues as follows:
>
> Here, the evidence shows that Fidelity asserts a high level of control over Admen. Pursuant to the Fidelity-Admen Seller Agreement, Admen was required to use Fidelity's ViciDial system in soliciting sales of Defendant EFG's vehicle service contracts. Admen was also required to use – and only use – Fidelity-approved marketing materials and telemarketing scripts. Further, Admen employees were required to undergo Fidelity's training program. Finally, Fidelity had the ability to, and did, monitor its third-party telemarketers' calls.

Doc. 66 at 13-14 (record citations omitted). However, in so arguing, Kahler seeks to avoid entirely the impact of the terms and conditions of the Independent Seller Agreement entered into between Fidelity and Admen.

As asserted by Kahler above, the Agreement required, among other things, that Admen to do as follows: 1) to sell vehicle service contracts in a professional manner; 2) to use only Fidelity-approved marketing materials and scripts; 3) to accurately disclose all fees related to the contracts; and 4) to use only electronic communication systems provided by Fidelity. However, the Agreement also stated that the parties "are and shall be deemed for all purposes to be independent entities." Doc. 55-2 at 4. "Nothing contained in this Agreement shall be construed to create a relationship of partnership or joint venture for any purpose whatsoever." Doc. 55-2 at 4.

**Actual Authority**

With respect to actual authority, the Sixth Circuit has noted:

> the clear wording of the operative contract between CUnet and CornerBlue states "that the parties to th[e] Agreement are independent contractors" and that CornerBlue has "no authority to make or accept any offers or representations on [CUnet's] behalf." Such contractual language flies directly in the face of the classic definition of common-law agency: "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). Because CornerBlue was never authorized to act on CUnet's behalf, but rather only pursuant to contractual obligations, no principal-agent relationship was established.

*Keating*, 615 Fed. Appx. at 372. The language contained in the Agreement between Admen and Fidelity compels a similar conclusion.

In considering a similar type of agreement, the Ninth Circuit has also found no agency relationship.

> First, we acknowledge that Royal exercised some amount of control over AAAP. AAAP was required to keep records of its interactions with consumers who

purchased Royal VSCs, give Royal weekly reports on VSC sales, and provide notice of requests to cancel Royal VSCs. AAAP was also required to implement security measures to protect consumer information, collect payments on behalf of Royal, and obtain Royal's approval before using sales literature to assist in the sale of Royal VSCs. Moreover, AAAP was only permitted to use the "scripts and materials" Royal approved and had to comply with the "guidelines and procedures" Royal provided when selling Royal products. These guidelines and procedures generally required AAAP to "operate in accordance with laws and regulations" and refrain from making "false and misleading" representations.

*Jones v. Royal Admin. Servs., Inc.,* 866 F.3d 1100, 1106 (9th Cir. 2017). The Ninth Circuit then analyzed the ten factors set forth in the Restatement (Second) of Agency and concluded that "it is clear that AAAP's telemarketers were independent contractors rather than agents. AAAP was its own independent business that sold VSCs for multiple companies without the direct supervision of a Royal employee. AAAP provided its own equipment, set its own hours, and only received payment if one of its telemarketers actually made a sale." *Id.* at 1108. Given the holding in *Keating* and the rationale utilized in *Jones*, the Court finds no principal-agent relationship exists that granted Admen actual authority to act on Fidelity's behalf.

**Apparent Authority**

*Keating* also detailed the law surrounding apparent authority:

The Restatement (Third) of Agency, section 2.03, defines "apparent authority" as "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Stated differently, under the theory of apparent authority, a principal will incur liability for the acts of an "agent" if the principal "held the agent out to third parties as possessing sufficient authority to commit the particular act in question, and there was reliance upon the apparent authority." *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir.1998). Thus, "[t]he apparent power of an agent is to be determined by the act *of the principal and not by the acts of the agent* ... [.]" *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir.2005) (quoting *Master Consol. Corp. v. BancOhio Nat'l Bank*, 61 Ohio St.3d 570, 575 N.E.2d 817, 822 (1991)).

*Keating*, 615 Fed. Appx. at 373-74. The Court then concluded: "As has been stated previously, nothing in the record before this court reasonably can be construed to indicate that the defendants held out to third parties, or to anyone else, that CornerBlue was authorized to send text messages to individuals who had not agreed to receive them." *Id.* at 374.

Kahler seeks to avoid this result by asserting that Fidelity committed numerous acts that support apparent authority. For example, Kahler asserts that 1) Fidelity allowed Admen to access information and systems that are normally within Fidelity's exclusive possession, 2) Fidelity provided the scripts for Admen to utilize, 3) Fidelity allowed Admen to use its trade name, trademark and service mark, and 4) Fidelity allowed Admen to enter information into its computer system. The Court, however, agrees with Fidelity that none of these factors, alone or combined, support a claim of apparent authority.

First, the record does not support a finding that Admen has access to any information or system that was "normally" within the "exclusive" control of Fidelity. In support of this factor, Kahler contends that Fidelity required Admen to use its ViciDial system. However, nothing in the record supports a finding that this open source dialing system was ever in the "exclusive" control of Fidelity, let alone was normally maintained in such an exclusive manner.

Second, the Court agrees with Fidelity with respect to marketing materials. The provision and approval of marketing scripts is insufficient to create an issue of fact surrounding apparent authority. "[A]ssisting a party in setting up telemarketing centers or providing scripts for in-person calls is not evidence of agency." *In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d 514, 521 (N.D.W. Va. 2016), *aff'd sub nom. Hodgin v. UTC Fire & Sec. Americas Corp.*, No. 17-1222, 2018 WL 1308605 (4th Cir. Mar. 14, 2018).

Third, the Court finds no evidence in the record that Fidelity allowed Admen to use its trade name or any registered mark. Rather, the sole evidence in the record indicates that on one occasion an Admen employee identified him or herself as calling from National Warranty Services, a dba of Fidelity. The record, however, does not contain any evidence that Fidelity authorized or approved of the use of its tradename. Kahler seeks to have the Court infer this fact from the fact that Admen employees receive training from Fidelity. The record does not disclose what this training entails and it certainly does not contain evidence that Admen employees were trained and authorized to use Fidelity's tradename.

Finally, the Court does not believe that Admen's ability to enter information into Fidelity's computer system aids in the apparent authority analysis in any manner. This fact is not an "outward" manifestation in any manner. Kahler, nor any other potential call recipient, could not know this fact. As such, it could not have caused Kahler to believe that Admen had apparent authority.

Based upon the above, the Court finds no material issue of genuine fact remains with respect to apparent authority and judgment in favor of Fidelity on this issue is appropriate.

**Ratification**

Kahler also contends that Fidelity ratified the acts of Admen. "Liability based on ratification arises when a seller ratifies the unlawful acts by knowingly accepting their benefits—for example, through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences." *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1198 (M.D. Tenn. 2017)(citation and quotation omitted). At its core, Kahler's argument appears to be that Fidelity required Admen to use its ViciDial system and the system is incapable of complying with the TCPA. Kahler argues therefore that by requiring

Admen to use that system, Fidelity has ratified the conduct. Once more, the record does not contain evidence that by simply using the ViciDial system, any entity would violate the TCPA. Moreover, there is no evidence in the record that Fidelity was ever aware of Admen violating the TCPA in any capacity. As such, Kahler's ratification argument has no merit.

In conclusion, Fidelity has demonstrated that there is no genuine issue of material fact surrounding any of Kahler's theories of agency. Further, it is undisputed that Fidelity did not directly make the calls at issue. As a result, there exists no viable theory under which to hold Fidelity liable in this matter.

**EFG**

With respect to EFG, Kahler has argued that EFG is liable because Fidelity had the actual authority to make the calls at issue. Finding that Fidelity is not liable serves to cut off any liability that could flow to EFG as well. In other words, as Fidelity cannot be held liable herein, it follows that judgment must also be entered in favor of EFG.

**IV. Conclusion**

Both Defendants' motions for summary judgment are GRANTED. Judgment is hereby entered in favor of Defendants. The complaint is hereby DISMISSED.

       IT IS SO ORDERED.


Date: March 16, 2018            */s/ John R Adams*
                                                                 JOHN R. ADAMS
                                                                  U.S. DISTRICT JUDGE